**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**JOHN BAKER,**

     **Plaintiff,**

    **vs.**                             **Civ. No. 21-439  JFR/KK**

**UNITED PARCEL SERVICE, INC.,
LEO LANE, and JOHN DOE,**

     **Defendants.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on Defendants United Parcel Service, Inc. ("UPS") and Leo Lane's Motion for Summary Judgment ("Motion"), filed December 23, 2021.  Doc. 37. Plaintiff filed a Response on January 5, 2022.  Doc. 45.  Defendants filed a Reply on January 19, 2022.  Doc. 48.  After careful consideration of the pertinent law and the parties' briefing, the Court concludes that Defendants' Motion is well taken and that Defendants are entitled to summary judgment.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On November 5, 2020, Plaintiff filed a *Complaint for Compensatory and Punitive Damages* in the Second Judicial District Court, Bernalillo County, State of New Mexico, against AlliedBarton Security Services, LLC ("Allied"), UPS Ground Freight, Inc. ("UPSGF"), Leo Lane, and John Does 1-2.  Doc. 1-1.  Plaintiff's Complaint included claims for General Negligence (Count I), Respondeat Superior: Allied (Count II), Respondeat Superior: UPS (Count III), Negligent Hiring Against Allied (Count IV), Negligent Hiring Against UPS (Count V), and

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 10.)

Joint and Several Liability (Count VI).  In his Complaint Plaintiff stated that on November 20, 2017, he was an employee of Allied providing security services at the UPS Customer Center.  *Id.* at 2, ¶ 10.  As part of his duties, Plaintiff was required to use bolt cutters to remove padlocks on freight trucks upon their arrival at the UPS Customer Center.  *Id.* at ¶ 11.  Plaintiff alleges that Amazon freight trucks had a particular type of padlock that was "dangerous and difficult to attempt to cut with bolt cutters," and that Allied employees would often need to have them cut with an electrical grinder, "which was a safer method" than using bolt cutters.  *Id.* at 3, ¶¶ 13-15. Plaintiff alleges that on November 20, 2017, an Allied supervisor informed Plaintiff that he was required to cut two Amazon truck locks with a bolter cutter.  *Id.* at ¶ 16.  Plaintiff alleges that over his objections Defendant Leo Lane, a manager with Defendant UPSGF, directed Plaintiff to either cut the locks with the bolt cutter or be fired from his position with Allied.  *Id.* at ¶¶ 17-18. Plaintiff alleges he proceeded to use the bolt cutters and suffered serious injuries to his shoulder as a result of Defendants' actions or failures to act.  *Id.* at ¶¶ 19-25.

On April 12, 2021, before any answers had been filed, Plaintiff filed a *First Amended Complaint for Compensatory and Punitive Damages*, in which he removed claims previously asserted against Allied, UPSGF, and John Does 1 and 2.  Doc. 1-2, Doc. 1 at 2.  Plaintiff's Amended Complaint instead named United Parcel Services, Inc. ("UPS"), Leo Lane and John Doe as Defendants.  Doc. 1-2.  Based on the same Statement of Facts, Plaintiff's Amended Complaint brought claims for General Negligence (Count I), Respondeat Superior (Count II), Negligent Hiring Against UPS (Count III), and Punitive Damages (Count IV).  Id.

On May 10, 2021, Defendants UPS and Leo Lane removed the matter to this Court pursuant to 28 U.S.C. §§ 1332(a), 1441(a) and (b), and 1446.  Doc. 1.

On October 14, 2021, Plaintiff filed a [Second] *Amended Complaint for Compensatory and Punitive Damages* ("Second Amended Complaint").  Doc. 31.  Plaintiff removed John Doe as a Defendant and added a claim of Prima Facie Tort against Defendants UPS and Leo Lane. *Id.* at 4-5.  To recap, Plaintiff's Second Amended Complaint includes claims for General Negligence (Count I), Prima Facie Tort (Count II), Respondeat Superior (Count III), Negligent Hiring (Count IV), and Punitive Damages (Count V).

On December 23, 2021, Defendants filed their Motion for Summary Judgment presently before this Court.  Doc. 37.

## II. SUMMARY OF ARGUMENTS

Defendants argue that Plaintiff's tort claims must be dismissed in their entirety because Plaintiff expressly waived his right to pursue legal action for work-related injuries against customers of his employer, Allied, and because Plaintiff has failed to provide any evidence that Defendants acted recklessly toward or intentionally harmed Plaintiff.  Doc. 37 at 1, 6, 9. Defendants explain that on the date Allied hired Plaintiff, September 21, 2017, Plaintiff signed a Customer Claim Waiver & Release ("Waiver & Release") in which Plaintiff waived and released any and all rights to "make a claim, commence a lawsuit, or recover damages or losses," from any Allied customer "arising from or relating to injuries that may occur in the course and scope of [] employment while on the job site."  *Id.* at 3. Defendants argue that it is undisputed that UPS is an Allied customer and that under New Mexico law UPS and its employees are third-party beneficiaries of the waiver agreement between Plaintiff and Allied and have an enforceable right thereunder.  *Id.* at 1, 5.  Defendants further argue that the waiver agreement is enforceable because it is clear and unambiguous and is not contrary to public policy.  *Id.* at 6-11.

Plaintiff responds by arguing that even assuming arguendo Defendants are third-party beneficiaries of the Waiver & Release, the contract is invalid and unenforceable as against public policy.  Doc. 45 at 7.

### III.  SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  *See id.* at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670-71 (10th Cir. 1998).

At the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).  As with any fact asserted by a party in a summary judgment motion, the non-movant must point the Court to such support by "citing to particular parts of materials in the record[.]"  Fed. R. Civ. P. 56(c)(1)(A).  All material facts set forth in the motion and response that are not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not

necessarily need to be presented in a form admissible at trial).  *See Celotex Corp*., 477 U.S. at 324; *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.' "  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir. 1995); *see also Starr v. Pearle Vision, Inc.,* 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001) (refusing to consider declaration that was based on hearsay rather than personal knowledge and did not attach copies of records referenced therein).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  *See Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

## IV.  MATERIAL FACTS

### A.  Stipulated Undisputed Facts

On or about September 21, 2017, Allied hired Plaintiff to work as a security guard in New Mexico.  On the same date, Plaintiff entered into a contractual customer release agreement with Allied as follows:

**CUSTOMER CLAIM WAIVER & RELEASE**

*This document limits your ability to recover damages arising from personal injuries sustained in the course and scope of your employment while on Allied Universal job sites.* ***Please read carefully.***

I understand that I will be assigned to provide security guard services at a site owned, managed or operated by a client of Universal Services of America LP, d/b/a Allied Universal, or its affiliates ("Allied Universal") or other third parties.  I also understand that I may be injured in the course and scope of my employment with Allied Universal . . . .

In consideration of Allied Universal offering and/or maintaining my employment, **I hereby waive and forever release any and all rights I may now have or may have in the future, to make a claim, commence a lawsuit, or recover damages or losses, including those for pain and suffering or lost wages, from or against any current or future Allied Universal customer, its management, employees, agents, parent, subsidiary or affiliated companies, arising from or relating to injuries that may occur in the course and scope of my employment while on the job site.**  This Waiver and Release shall not affect or diminish my rights to Workers' Compensation benefits in any manner whatsoever.

(emphasis in original).  UPS is a customer or client of Allied.  Plaintiff worked at the UPS facility located on Comanche Road in Albuquerque, New Mexico.  Plaintiff was the "Security Supervisor/Working Officer," which meant that he supervised Allied employees, worked as a security officer, and was the primary liaison to the UPS security supervisor, Leo Lane.  UPS gave directives to remove bolt seals and provided the bolt cutters Allied employees used to remove bolt seals from delivery trucks.  Plaintiff's tort claims arise from a bicep tear he incurred using the bolt cutters removing an Amazon seal in the course of his work as a security guard at the UPS Commerce Center.

**B.     <u>Disputed Facts</u>**

Plaintiff disputes Defendants' material fact number "5" which states "[t]here is no evidence that UPS or its employees intended Plaintiff to be injured by a bolt cutter on

November 20, 2017, nor is there evidence that UPS or its employees recklessly disregarded a known risk that Plaintiff would be injured by a bolt cutter." (Citation omitted.) Doc. 45 at 2.

Defendants dispute as inadmissible irrelevant speculation Plaintiff's material fact letter "e" which states "Mr. Baker was in no position to bargain with Allied over the release waiver even if it caught his attention at the time he agreed to it." (Citation omitted.) Doc. 48 at 2. Defendants dispute Plaintiff's material facts letters "g-h" to the extent they are offered to prove an employment relationship between UPS and Allied employees.[2] *Id.* at 3. As for Plaintiff's material facts letters "i-r,"[3] Defendants dispute as immaterial that for some period of

---

[2] Plaintiff's Statement of Undisputed Material Facts g and h state:

> g. UPS and Defendant Lane had control over the UPS facility site and exercised some control over Allied employee work activities.

> h. UPS provided the bolt cutters that Allied employees were to use to cut the subject seals.

Doc. 45 at 3, ¶¶ g and h (citations omitted).

[3] Plaintiff's Statement of Undisputed Material Facts i through r state:

> i. Prior to Mr. Baker's injury, other Allied employees had been injured removing the seals from the Amazon trucks.

> j. Prior to Mr. Baker's injury, Mr. Baker told Defendant Lane that removing the Amazon seals was dangerous and that other Allied employees had injured themselves to various degrees.

> k. At some point after Mr. Baker advised Defendant Lane of the dangers of cutting the seals with bolt cutters, UPS and Defendant Lane allowed Allied employees to send Amazon trucks to the UPS mechanic shop where a grinder was used to cut through the Amazon seals.

> l. After a period of allowing Allied employees to cut the seals with the UPS shop grinders, Defendant Lane advised Mr. Baker that UPS employees complained about having to cut the locks.

> m. Defendant Lane informed Mr. Baker that Allied employees were no longer allowed to send the trucks to the UPS shop.

> n. Mr. Lane advised Mr. Baker that from that point forward, Allied employees were to cut the Amazon seals themselves – using the bolt cutters provided by UPS.

> o. Mr. Baker advised Defendant Lane that "someone is going to get hurt" cutting the seals with bolt cutter.

> p. Defendant Lane made it clear that using the bolt cutters was the only option available to Allied employees.

time Defendants allowed Allied employees to send Amazon trucks to the UPS mechanic shop where a grinder was used to cut through the Amazon seals and that Plaintiff told Defendant Lane that removing the Amazon seals with bolt cutters was dangerous and that "someone is going to get hurt," and argue that this does not establish that use of the bolt cutters was dangerous or that Defendant Lane knew or should have known that they were dangerous. *Id.* at 4. Defendants further dispute as immaterial and inadmissible hearsay the affidavit testimony Plaintiff submitted to support that other Allied employees had been injured to some degree using the bolt cutters thereby creating a known risk. *Id.* at 3-4.

## V. <u>ANALYSIS</u>

### A. <u>Briefing</u>

#### 1. <u>Defendants' Motion</u>

In their Motion, Defendants argue they are entitled to assert their rights as third-party beneficiaries to the Waiver & Release. *Id.* Defendants argue that the Waiver & Release is clear and unambiguous and shows that Plaintiff agreed to waive his right to assert legal claims against Allied customers or their employees for injuries arising in the course and scope of Plaintiff's employment with Allied. Doc. 37 at 6. Defendants further argue that the Waiver & Release does not trigger any public policy concerns against its enforcement because (1) Plaintiff has presented no evidence from which a fact-finder could conclude that the UPS employees who asked Plaintiff to use the bolt cutters made the request recklessly or with an intent to harm Plaintiff; and (2) the guiding factors when addressing the validity of liability releases, such as the

---

q. Mr. Lane gave this directive knowing that other Allied employees had been injured.

r. Mr. Lane gave this directive with notice of the dangers of using the bolt cutters.

Doc. 45 at 3, ¶¶ i – r (citations omitted).

one at issue here, weigh in favor of enforceability.[4]  *Id.* at 9-11.  To Defendants' latter argument, they assert that the contract at issue here is not one for public services and does not concern a business of a type generally thought suitable for public regulation.  *Id.* at 11.  They further assert that even if UPS held itself out as providing a service of practical necessity to the public, Plaintiff was not a customer of UPS but an employee of Allied providing security to UPS  *Id.* Accordingly, Defendants argue that the Waiver & Release was not executed within a transaction where UPS possessed a "decisive advantage of bargaining strength against any member of the public who seeks [UPS's] services," such that it "confront[ed] the public with a standardized adhesion contract of exculpation."  *Id.* (citing *Berlangieri v. Running Elk Corp*., 2003-NMSC-024, ¶ 39, 76 P.3d at 1109-10).

Defendants attach two affidavits in support of their Motion.  Doc. 37 at 13-17.  The first is the Affidavit of Nicholas Blanchette, a manager of personnel records for Allied.  *Id.*  The second is the Affidavit of Leandro Lane, Area Security Manager for UPS.  *Id.*

### 2.    Plaintiff's Response

Plaintiff contends that the Waiver & Release fails as a matter of public policy for several reasons.  Doc. 45 at 6-11.  First, Plaintiff asserts that it is well settled that release waivers between employers and employees are the exception to valid liability waivers, and that this contract is unconscionable because Plaintiff's desire for employment and need for economic sustenance put him at a tremendous disadvantage in negotiating his position as an Allied employee working at UPS.  *Id.*  Second, Plaintiff asserts, also citing *Berlangieri*, that the guiding factors when addressing the validity of liability releases weigh in favor of finding the Waiver & Release unenforceable.  *Id.*  In support, Plaintiff contends that "there's a colorable argument that

---

[4] Defendants cite *Berlangieri v. Running Elk Corporation*, 2003-NMSC-024, 76 P.3d 1098.

the first three factors are present" because this contract falls in the "arena of employer-employee." *Id.* Plaintiff further contends that it is "evident that the last three factors are present" because (1) Plaintiff was at a disadvantage when signing the waiver and has no recollection of "clicking" his acceptance; (2) Allied presented Plaintiff with a standardized adhesion contract of exculpation and Plaintiff was not in a position to negotiate; and (3) Plaintiff's person and safety were under the control of UPS. *Id.* Third, Plaintiff asserts that harm caused recklessly cannot be exempted through a waiver. *Id.* In support, Plaintiff argues that Defendants had notice regarding the danger posed when attempting to cut the Amazon seals with the UPS bolt cutters but forced Plaintiff to use the bolt cutters nonetheless. *Id.*

Plaintiff attaches three affidavits to his Response. The first is his own affidavit in which he explains his version of events. Doc. 45-1 at 1-3. The second is the Affidavit of Daniel Lucero, a former Allied security guard. Doc. 45-2 at 1-2. The third is the Affidavit of Chris Twitchell, a former Allied security guard. Doc. 45-3.

### 3.   **Defendants' Reply**

Defendants object to and argue that the affidavits Plaintiff attached to his Response are insufficient to demonstrate that Defendant Lane intended to injure Plaintiff or recklessly disregarded a known risk of serious injury. Doc. 48 at 1. Defendants further argue that Plaintiff has failed to offer any competent opinion evidence that the use of bolt cutters to remove freight security seals was unreasonably safe, much less reckless. *Id.*

As to Plaintiff's public policy arguments, Defendants reiterate that the Waiver & Release does not exculpate Plaintiff's employer and explicitly preserves Plaintiff's entitlement to workers' compensation benefits in the event of a workplace injury. *Id.* at 5. Defendants argue that Plaintiff cites no authority for the proposition that the employment-related public policy

exception to liability waivers is grounded in the disparate bargaining power between employers and prospective employees.  *Id.*  Defendants argue that the dispositive rationale should be whether the inequality in bargaining power is used to deprive an employee of a remedy for an on-the-job injury.  *Id.*  Here, Defendants argue that the waiver is not grossly or unfairly favorable to the employer given that it preserves a remedy for employees injured on the job.  *Id.* at 5-6.  Defendants also argue that Plaintiff's conclusory assertion that he was in no position to negotiate the terms of his contract with Allied is insufficient to show that the Waiver & Release was a contract of adhesion.  *Id.*

As for the other factors to be considered, Defendants concede that labor and employment relationships generally are subject to regulation, but argue Plaintiff has not identified any specific legislative policy that would weigh in favor of finding that the contract between Allied and Plaintiff is affected with a public interest.  *Id.* at 7.  Defendants argue that Plaintiff has pointed to no statute or regulation governing security companies nor to any authority for the proposition that Allied is providing a service "of great importance to the public," which is "of practical necessity for some members of the public."  *Id.*  Here, Defendants assert, the contract at issue was not for services of any kind, but for employment.  *Id.*  Defendants further assert that while there was some disparity in bargaining power between Plaintiff and Allied, the contract here was not an adhesion contract and did not leave Plaintiff without a remedy for injuries on the job.  *Id.*

Lastly, Defendants contend that Plaintiff has failed to present any evidence that creates a material dispute of fact that UPS knew the use of bolt cutters was "dangerous" or knew of any Allied employees other than Plaintiff that had been seriously injured.  *Id.* at 7-8.  Defendants contend that the affidavits attached in support of Plaintiff's Response offer inadmissible hearsay about knowledge of others who might have been injured and/or insufficient evidence

demonstrating actual injury.  *Id.*  Finally, Defendants contend that Plaintiff has failed to offer

expert opinion testimony to support his conclusion that the use of bolt cutters to cut security seals

on freight trucks posed an unreasonable danger or was reckless.  *Id.*

> **B.**    **The Waiver Is Enforceable**
>
> > **1.**    ***Berlangieri* and the *Tunkl* Factors**

Both parties cite and rely on the New Mexico Supreme Court's decision in *Berlangieri v.*

*Running Elk Corporation*, 2003-NMSC-024, 76 P.3d 1098, to support their respective positions

regarding the enforceability of the Waiver & Release.  Berlangieri was a guest at a recreational

resort facility and signed a liability waiver so that he could participate in a guided horseback trail

ride.  76 P.3d at 1100-02.  Berlangieri was a novice rider and the defendant's staff informed him

that "horseback riding entailed certain unavoidable risks of injury due to the unpredictable nature

of horses."  *Id.*  Berlangieri was injured when, as an apparent result of the saddle sliding to the

side – either because it had been improperly positioned or as a consequence of equipment failure,

he fell off the horse as it was running.  *Id.*  Berlangieri sued the facility for injuries he sustained

during the horseback trail ride, alleging negligence and other theories of liability.  *Id.*

Defendant filed a motion for summary judgment arguing (1) that the Equine Liability Act

insulated it from liability because the accident was the result of "equine behavior"; and (2) that

the liability release exculpated it from all liability for negligence.  76 P.3d at 1102.  The state

district court denied summary judgment as to defendant's first argument, but granted defendant's

motion as to the second argument holding that the release was enforceable because there was no

relevant exception to the general rule that releases of liability or negligence are enforceable.  *Id.*

Berlangieri appealed and argued that the release was unenforceable as a matter of public policy.

*Id.*

The New Mexico Court of Appeals reversed the district court's order and remanded the case for a trial on the merits.  76 P.3d at 1102-03.  The court held that " 'the societal interests furthered by the law of negligence' dictate that releases of liability for negligence should never be enforceable when a risk of 'serious physical injury or death to the releasor' is at stake."  *Id.*  In dissent, Judge Jonathan Sutin disagreed with the "absolute end of the spectrum view taken by the majority as a solution to the concerns about releases" and argued it would be wiser to consider releases on a case by case basis.  *Id.*  Finding no public policy independent of the Equine Liability Act to support invalidation, Judge Sutin believed the release should be enforced and would have affirmed the district court's ruling.  *Id.*

The New Mexico Supreme Court agreed with Judge Sutin that releases should be considered on a case by case basis, but disagreed with both underlying courts that they could not rely on the Equine Liability Act in analyzing public policy relevant to the case.  76 P.3d at 1103.  Indeed, the New Mexico Supreme Court ultimately held that the legislative intent of the Equine Liability Act expressed a policy that equine operators should be accountable for their own negligence such that a public policy exception to the enforcement of the liability waiver applied.  76 P.3d at 1110-11.  In reaching its holding, the court explained, *inter alia*, that New Mexico courts have generally held that agreements that exculpate one party from liability for negligence will be enforced, unless they are "violative of law or contrary to some rule of public policy."  76 P.3d at 1104.  The court discussed the challenges of determining what would be a sufficient "public policy" to invoke the exception to the rule and recognized that "[f]reedom of contract serves public policies that are no less important to society as a whole and the common good than those policies that undergird the law of tort."  76 P.3d at 1104-05.  The court held that "liability releases for personal injury may be enforced in [those] limited circumstances" in which the

release (1) survives a strict construction analysis and, (2) does not contravene public policy.  76

P.3d at 1107, 1109.  The strict construction and public policy principles established in

*Berlangieri* are discussed in greater detail, as they relate to the facts of this case, in the ensuing

analysis.

Notably, *Berlangieri* involved a transaction between an individual customer and a

business providing recreational services, while this case involves a transaction between an

employer and employee and third-party beneficiaries to that transaction.  *Berlangieri* did not,

however, limit itself to the former situation and eschewed attempts to distinguish between

liability release cases.  *See generally,* 76 P.3d at 1104 ("The appellate courts of this state have

generally held that agreements that exculpate one party from liability for negligence will be

enforced, unless they are 'violative of law or contrary to some rule of public policy.' . . .  The

Court of Appeals' majority is correct to point out, however, that each time this Court has applied

the rule, it has been in the context of purely economic damages, rather than personal injury.  . . .

Although previous cases . . . involved release for damages due to economic injuries arising out of

different contexts than the recreational industry, the cases never perceived such a distinction as

relevant.").  The federal court is bound to follow New Mexico law, and *Berlangieri* suggests that

if faced with the issue before the Court, it would apply the factors outlined therein to determine

whether the Waiver & Release at issue here is valid and enforceable.

### a.    The Waiver & Release Is Sufficiently Clear and Unambiguous

Pursuant to *Berlangieri*, courts endeavoring to strictly construe a liability release against

the drafter must consider whether the language of the release is "sufficiently clear and

unambiguous that it would inform the person signing it of its meaning."  76 P.3d at 1107.  To be

enforceable, the language in the release must have "such clarity that a person without legal

14

training can understand the agreement he or she has made." 76 P.3d at 1108. Plaintiff's Response does not address this consideration. The Court nonetheless considers the Waiver & Release applying this standard.

To begin, the Waiver & Release is conspicuous and contained on its own separate page. Doc. 37 at 15. The title of the document is in large bold print. *Id.* Directly below the title is a one-sentence explanation in italics regarding the document's purpose. *Id.* The one-sentence explanation concludes with a bolded and italicized directive to "***Please read carefully***." Doc. 37 at 15. The Waiver & Release then consists of two paragraphs. The first paragraph contains four sentences. *Id.* In the first sentence, the prospective employee is affirming his or her understanding that they will be assigned to provide security guard services at various Allied owned, managed or affiliated third-party sites. *Id.* In the second and third sentences, the prospective employee is recognizing that he or she may be injured in the course and scope of employment with Allied for which Allied provides workers' compensation benefits. *Id.* In the fourth sentence, the prospective employee affirms his or her understanding regarding notice requirements in the event of an injury on the job. *Id.* The second paragraph contains two sentences. The first sentence sets forth the terms of the waiver in bold print. *Id.* The second sentence reaffirms that the waiver does not affect or diminish an employee's rights to workers' compensation benefits in any manner whatsoever. *Id.* The Waiver & Release concludes with a signature block in which the signing party affirms that by "checking the checkbox above" he or she is providing the equivalent of their handwritten signature. *Id.*

Applying the *Berlangieri* criteria and strictly construing the language of the release against the drafter, the Court finds that the Waiver & Release is appropriately labeled and conspicuous, provides helpful and clear signals, and is brief and straightforward in its purpose.

The plain language of the Waiver & Release limits its application to Allied's "customers" and Allied's employees.  The disclaimer makes clear that part of the consideration which the employer (Allied) was receiving in exchange for offering employment to Plaintiff was his assurance that, if he were injured while on the job, he would seek only the remedies available under the Workers' Compensation Act and would not sue Allied's valued customers.  Thus, the Court finds that the disclaimer specifically explains the rights released, the beneficiaries of the release, and the situations in which the release applies.  The Court further finds that a person without legal training should be able to understand its meaning and that it has only one reasonable interpretation.  The Court, therefore, finds that Defendants have made a *prima facie* showing pursuant to Fed. R. Civ. P. 56 that the language of the release form is sufficient to constitute an enforceable agreement under this first consideration.  *Berlangieri*, 76 P.3d at 1108-09.

### b.     The *Tunkl* Factors Weigh In Favor of Enforceability

The next inquiry is "whether the release is affected with a public interest such that it is unenforceable as contrary to public policy."  *Berlangieri,* 76 P.3d at 1109.  The Supreme Court of New Mexico has adopted "the non-exclusive list of factors from *Tunkl* [*v. Regents of University of California,* 60 Cal.2d 92, 383 P.2d 441 (1963)] to determine whether public policy should operate to void the release."  *Id.*  The New Mexico Supreme Court described the analysis under those factors:

> The attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics.  [1] It concerns a business of a type generally thought suitable for public regulation.  [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.  [3] The party holds himself [or herself] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.  [4] As a result of the essential nature of the service, in the economic setting of the

transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his [or her] services.  [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.  [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his ... agents.

76 P.3d at 1109–10 (citation and internal quotations omitted). The New Mexico Supreme Court explained its belief that "it would be a rare case when a release exhibited all of these factors at once" and eschewed a simple balancing test of these factors.  *Id.*  It stated "[i]t would be possible that only one of these factors would be applicable, but that factor would be significant enough to make the release unenforceable."  *Id.* "These six factors are only indicators that are helpful in determining the larger question of whether enforcement of the release would be unjust."  *Id.*

### (1)   The First Factor

The first factor addresses whether the liability release concerns a business of a type generally thought suitable for public regulation.  Defendants concede that labor and employment relationships generally are subject to regulation, but argue that Plaintiff has failed to identify any legislative policy that would weigh in favor of finding that the contract between Allied and Plaintiff is affected with a public interest.  Plaintiff states only that employers have long been regulated.

The Court agrees that there are any number of federal, state and local regulations and employment laws that could and do apply generally to labor and employment relationships.  That said, Plaintiff has cited no authority to demonstrate that Allied and/or UPS are subject to "special regulatory treatment" such that the first *Tunkl* factor would apply to invalidating the waiver.  *See Tunkl*, 383 P.3d at 445 n.9 (stating that the public regulation factor applies where a contract modifies "the responsibilities normally attaching to a relationship which has been regarded in

17

other connections as a fit subject for special regulatory treatment"); *see also Lynch v. Santa Fe Nat'l Bank*, 627 P.2d 1247, 1252 (N.M. 1981) (distinguishing a bank's performance of "banking function[s]" which are subject to "extensive statutory regulations" and which are "an important and necessary public service" from an escrow service provided by a bank, a service that was not subject to extensive regulations to conclude that the latter does not satisfy the first *Tunkl* factor); *Dominguez v. United States*, 2018 WL 1135538, ¶ 10 (D.N.M. 2018) (parties cite no authority for proposition that recreational climbing or rappelling was subject to "special regulatory treatment" such that first factor would apply to the waiver); *Levin v. Airgas Southwest, Inc.,* 2006 WL 1305040, ¶¶ 14-15 (D.N.M. 2006) (there was not much support for the notion that defendant Airgas's business and the sale of liquid nitrogen was the type generally thought suitable for public regulation).  As such, the Court finds this factor is not dispositive either way as to the enforceability of the Waiver & Release.

### (2)      The Second and Fourth Factors

The second and fourth factors are interrelated and pertain to circumstances in which a release pertaining to a service of "great importance" or "practical necessity" gives the releasor a "decisive advantage of bargaining strength" over the releasee.  *Berlangieri*, 76 P.3d at 1113 (observing that the second *Tunkl* factor relates to the "superior bargaining power" that is "more likely to exist when the service is of practical necessity to the public").  Defendants argue that even if UPS, as the released party, held itself out as providing a service of practical necessity to the public, which Defendants argue is doubtful given that the public has access to numerous shipping companies, Plaintiff was not a customer of UPS, but an employee of a company providing security to UPS.  Doc. 37 at 11.  With that in mind, Defendants contend that the Waiver & Release was not executed within a transaction where UPS possessed a "decisive

advantage of bargaining strength against any member of the public who seeks [UPS's] services." *Id.*

Plaintiff asserts that "employers provide a great public service – a necessity to members of the public," and that UPS possessed a decisive advantage in its bargaining strength because Plaintiff's desire for employment and need for economic sustenance put him at a tremendous disadvantage in negotiating his position as an Allied employee working at UPS.  Doc. 45 at 8. Plaintiff further asserts that the inequality in bargaining power renders the Waiver & Release unconscionable.  *Id.* Plaintiff additionally provides affidavit testimony that he has no recollection of signing or "clicking" on the release waiver, likely because he had so many forms to fill out at the time of his hire.  Doc. 45-1 at 1.

To begin, Plaintiff has failed to provide any evidence to dispute that he was an employee of Allied, and not UPS.  As such, Plaintiff's reliance on an employer-employee relationship between himself and UPS is misplaced.  Further, Plaintiff cites to no authority and has provided no evidence that UPS, the beneficiary of exculpation, provides services of public necessity that are equal to that of public utilities, public safety, public housing, innkeepers, or medical providers, or is under a public duty to make essential services available.  *Berlangieri*, 76 P.3d at 1113  (equating a service of practical necessity to a utility service); *see also Tunkl*, 383 P.2d at 445, n. 10 (indicating that places of public accommodation such as retail stores, restaurants, and businesses who have a duty to serve all comers "in the manner of innkeepers and common carriers of old" are providing services of public necessity); *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1262 (D.N.M. 2010), *aff'd*, 635 F.3d 1250 (10th Cir. 2011) (the court can think of no better example of a party engaged in performing a service of great importance to the public than the police department); *Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n*, 1960-

NMSC-052, ¶ 25, 353 P.2d 62, 69 (explaining that to allow public utilities to contractually limit their liability "would put the individual or corporation using and paying for its power at the mercy of the public service corporation"); *Milligan v. Big Valley Corp.,* 754 P.2d 1063, 1066 (Wyo. 1988) (citing *Malecha v. St. Croix Valley Skydiving Club,* Minn.App., 392 N.W.2d 727, 730 (1986)) (listing the types of services thought to be subject to public regulation, and therefore demanding a public duty or considered essential, to include common carriers, hospitals and doctors, public utilities, innkeepers, public warehousemen, employers, and services involving extra-hazardous activities).

Nor has Plaintiff provided evidence, as discussed above, that UPS is subject to heightened regulation.  To the contrary, UPS is one of several *private* parcel delivery services, *e.g.,* UPS, FedEx, DHL, to name a few, which are accessible to the public.  Thus, because UPS was not providing an "essential service," and because Plaintiff was not acting as a member of the public seeking UPS's services when he signed the Waiver & Release, Plaintiff has not provided evidence that he was subjected to a "decisive advantage of bargaining strength against any member of the public who seeks [its] services."  *See Berlangieri*, 2003-NMSC-024, ¶ 51, 76 P.3d at 1113 (explaining that superior bargaining power is more likely to exist when the service is of a practical necessity to the public).

Further, Plaintiff has not provided evidence to demonstrate that the contract was procedurally unconscionable based on his need for employment.[5][6] "A contract is procedurally

---

[5] A contract may be held to be substantively unconscionable when the "terms are unreasonably favorable to one party." *Guthmann*, 103 N.M. at 511 ("A contract that does not violate public policy is not unconscionable unless one or more of its terms is grossly unfair under the circumstances as they existed at the time the contract was formed.").  Plaintiff's argument that Waiver & Release violates public policy is being addressed here.

[6] When determining whether a contract is procedurally unconscionable, the Court should consider whether the contract is one of adhesion.  *Davis v. USA Nutra Labs*, 303 F.Supp.3d 1183, 1196 (D.N.M. 2018) (citations omitted); *see also Rivera v. Am. Gen. Fin. Servs., Inc*., 2011-NMSC-033, ¶ 44, 150 N.M. 398, 259 P.3d 803, 817.  The Court considers whether the contract is one of adhesion when considering factor number five.

unconscionable not merely because of inequality in bargaining power, but only where the inequality is so gross that one party's choice is effectively non-existent." *Guthmann v. La Vida Llena,* 103 N.M. 506, 510, 709 P.2d 675, 679 (1985).  Factors to be considered include high pressure tactics, the relative education, sophistication or wealth of the parties, and relative scarcity of the subject matter of the contract.  *Id.*  Plaintiff alleges only that his desire for employment and need for economic sustenance put him at a tremendous disadvantage in negotiating his position as an Allied employee working at UPS.  Doc. 45 at 8; Baker Affidavit, 45-1 at 1, ¶ 7.  Plaintiff, however, makes no assertion of high pressure tactics or of being coerced into signing the Waiver & Release.  To the contrary, Plaintiff says he has no recollection of electronically signing the Waiver & Release.  Baker Affidavit, 45-1 at 1, ¶ 7.  Nor does Plaintiff make any allegations regarding a relative scarcity of available employment at the time he accepted employment with Allied.  Plaintiff in fact attests he is currently employed as a bus driver.  *Id.* at ¶ 3.

Thus, even in the face of some inequality in bargaining power, the facts as alleged here fail to demonstrate an inequality in bargaining power so gross that Plaintiff's choice was effectively non-existent.  *See Lovato v. FastBucks Wage and Benefits, LLC*, 2009 WL 10669474, *2 (D.N.M. Feb. 25, 2009).  Moreover, Allied, as Plaintiff's employer, did not exempt itself from liability on behalf of its employees who are injured in the course and scope of their employment. The Waiver & Release clearly and explicitly provides that nothing therein will "affect or diminish" an employee's rights to workers' compensation benefits.

Finally, Plaintiff has not demonstrated how his having no recollection of electronically signing the Waiver & Release bears on its alleged procedural unconscionability.  Plaintiff does

not contend that he did not have an opportunity to read or ask questions about the Waiver & Release and does not dispute that he signed the Waiver & Release at the time he was hired.  *See generally Ballard v. Chavez,* 117 N.M. 1, 3, 868 P.2d 646, 648 (1994) (it is the general rule that a person has a duty to read a contract and familiarize himself with its contents before signing). Moreover, Plaintiff has made no argument that the terms of the Waiver & Release were not sufficiently clear and unambiguous such that he would not have been informed of its meaning at the time he did so.

In sum, factors two and four weigh in favor of enforcing the Waiver & Release.

### (3)      Third Factor

The third factor asks whether the exempted party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.  Defendants argue that this transaction does not involve a member of the public seeking a particular service.  Doc. 37 at 11.  Plaintiff argues it applies because "employers (by regulation) hold themselves out to all members of the public that qualify."  Doc. 45 at 8.

Plaintiff's conclusory statement fails to address this factor in any meaningful way.  The Court agrees that this transaction does not involve the seeking of services by a member of the public.  The Court, therefore, finds that this factor weighs in favor of enforcing the Waiver & Release.

### (4)      Fifth Factor

The fifth factor asks whether the exempted party in exercising a superior bargaining power confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against

negligence.   Defendants argue that Plaintiff was not a customer and/or purchaser of UPS's

services, but an employee of a company providing security to UPS.  Doc. 37 at 11.  Accordingly,

Defendants contend that the Waiver & Release was not executed within a transaction where UPS

"confront[ed] the public with a standardized adhesion contract of exculpation."  *Id.*  Defendants

further contend that the contract did not leave Plaintiff without a remedy for injuries on the job.

Doc. 48 at 7.  Plaintiff asserts that the Waiver & Release amounts to a standardized adhesion

contract of exculpation because Plaintiff was not in a position to negotiate, "say to take a lower

wage in exchange for removal of the liability waiver."  Doc. 45 at 9.

The three elements of an adhesion contract are: (1) the contract must be in the form of a

standardized contract prepared by one party for the acceptance of the other; (2) "the party

proffering the standardized contract must enjoy a superior bargaining position because the

weaker party virtually cannot avoid doing business under the particular contract terms," and

(3) the contract must be offered to the weaker party on a take-it-or-leave-it basis, without

opportunity for bargaining.  *Guthmann*, 103 N.M. 506, 509.

The Court concludes the Waiver & Release does not satisfy the elements for an adhesion

contract.  To begin, the Waiver & Release, albeit standardized, was not prepared by the

exempted party, UPS, but prepared by Allied.  As for the second and third elements, Plaintiff has

not presented any evidence that Allied and/or UPS monopolized the local job market or that all

the employers in the area were using essentially the same contract terms.  *See Lovato*, 2009 WL

10669474, at *2 (finding employment agreement not a contract of adhesion where plaintiffs did

not allege that the defendant monopolized the local job market or that all the employers in the

area used essentially the same contract terms).  Additionally, Plaintiff has not presented any

evidence regarding a relative scarcity of or similarly termed available employment such that he

had no other employment options other than to do business under the particular terms of the Waiver & Release.  Finally, while Plaintiff argues he was not in a position to negotiate, he offers no evidence that he attempted to do so and was rebuffed.[7]  Moreover, as already stated several times, Plaintiff has presented no evidence that the Waiver & Release left him without a remedy in the face of a workplace injury.

In sum, Plaintiff has presented no evidence demonstrating that he could not avoid employment under these particular contract terms or that he was presented with a "take-it-or-leave-it" situation making him the subject of an adhesion contract.  The Court, therefore, finds that this factor weighs in favor of the validating the Waiver & Release.

### (5)   Sixth Factor

The final factor is that, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.  *Berlangieri,* 76 P.3d at 1109-10.  The *Berlangieri* court held that the sixth *Tunkl* factor weighed against enforcing the recreational release at issue in that case reasoning that plaintiff, who was a novice horseback rider, "could not independently verify that his saddle was mounted properly."  76 P.3d at 1113.  As such, the court held, Berlangieri was clearly subject to the risk of carelessness by the defendant's employees.  *Id.* at 1112-13.

With this in mind, the inquiry goes to determining whether an apparent discrepancy of knowledge, skill and experience existed in the context in which liability is being exempted.  In addressing this factor, Plaintiff, in conclusory fashion, states only that his person and safety were

---

[7]  In his Response, Plaintiff suggests hypothetically that he could have "say offer[ed] to take a lower wage in exchange for removal of the liability waiver," but presents no evidence that he attempted to do so at the time and that it was rejected.  Nor does Plaintiff explain how this would have worked to his advantage.

under UPS's control and that he faced the risk of carelessness at the hands of UPS and their

agent, Defendant Lane.  Doc. 45 at 9.  Plaintiff does not provide any information about his

knowledge, skill or experience as a security guard that he brought to bear on his work

environment at the time he accepted employment and signed the Waiver & Release thereby

placing him at risk of UPS's carelessness.  Moreover, the Waiver & Release did not leave

Plaintiff without a remedy even if UPS and/or its employees acted carelessly.

Importantly this transaction did not involve Plaintiff's purchase of services or products

from a seller of which he was unfamiliar and therefore subjected himself to Defendants'

carelessness in the face of that kind of transaction.  Instead, in exchange for employment,

Plaintiff signed a workers' compensation disclaimer whereby he waived his right to sue Allied's

clients for damages related to injuries covered under the New Mexico Workers' Compensation

Act.  Thus, Plaintiff's conclusory argument in the context of the transaction at issue here fails to

address the relevant inquiry as to the sixth factor described in *Berlangieri.*

The Court, therefore, finds this factor is not dispositive either way as to the enforceability

of the Waiver & Release.

### 3.   The Waiver & Release Does Not Release Intentional Tortious Conduct

Defendants argue that the Waiver & Release does not trigger the public policy rule

against enforcement of contracts for harms caused intentionally or recklessly.  Doc. 37 at 9.

They further argue that Plaintiff has presented no material or admissible evidence that any UPS

employee acted recklessly toward or intentionally harmed Plaintiff.  *Id.* at 6, 9-10, Doc. 48 at 1-

2, 7-9.  Doc. 37 at 6.  Plaintiff contends that Defendants' own recklessness which caused his

injury invalidates the Waiver & Release.  Doc. 45 at 10-11.

The Waiver & Release at issue here only waives an Allied employee's right to sue Allied's customers for injuries covered by *workers' compensation*.  It serves as a benefit to Allied's customers and in no way affects an employee's right to recover from Allied for workplace injuries.  More importantly, the Waiver & Release does not infringe on the public policy prohibition of waiving liability for intentional torts.  "Under the New Mexico Workers' Compensation Act, NMSA 1978 §§ 52-1-1 to -70, workers' compensation is a worker's exclusive remedy for injuries result from an accident at work." *Ramos v. Foam America, Inc.,* 2018 WL 3611057, *2 (D.N.M. 2018).  Thus, "non-accidental" injuries are exempted. *Id.; see also generally Matkins v. Zero Refrigerated Lines, Inc.,* 1979-NMCA-095, ¶ 6, 93 N.M. 511, 602 P.2d 195, 97 ("As a preliminary matter, it must be pointed out that the exclusivity provision of the Workmen's Compensation Act does not preclude an employee or his estate from seeking damages against a third party who is not an employer, coemployee, or insurer or guarantor of his employer, § 52-1-6, N.M.S.A.1978.").  Such a non-accidental injury arises when:

> (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury.

*Padilla v. Wall Colmonoy Corp.,* 2006-NMCA-137, ¶ 11, 140 N.M. 630, 633, 145 P.3d 110, 113, *as revised* (Oct. 31, 2006) (citing *Delgado v. Phelps Dodge Chino, Inc*., 2001-NMSC-034, ¶ 26, 131 N.M. 272, 34 P.3d 1148).  In other words, if Plaintiff's injury was in fact "non-accidental," the Waiver & Release does not preclude him from seeking damages against a third-party.[8]

---

[8] New Mexico case law addresses when workplace injuries fall outside of the Workers' Compensation Act and allows for recognized tort claims against an employer and/or third-party.  In *Delgado v. Phelps Dodge Chino, Inc*., 2001-NMSC-034, 34 P.3d 1148, the New Mexico Supreme Court broadened the scope of the accident exception with respect to employers and permitted a plaintiff to sue an employer for torts already recognized under state law when the torts were intentionally inflicted or willfully caused and therefore exempted from the New Mexico Workers' Compensation Act.  34 P.3d at 1155-56.  *Delgado,* and cases interpreting it, are helpful in illustrating what type of employer conduct

the court sought to address in broadening the non-accidental exception. *See Morales v. Reynolds*, 2004-NMCA-098, 97 P.3d 612, 616.

The New Mexico Court of Appeals has held that courts must keep the facts of *Delgado* in mind when determining whether an accident meets the *Delgado* test as a matter of law. *Morales,* 97 P.3d at 615. The plaintiff in *Delgado* worked at a copper smelting plant that distilled copper by superheating rock to over 2000 degrees Fahrenheit in a furnace. 34 P.3d at 1150-51. Inside the furnace, the superheated molten rock separated into usable copper ore, which was skimmed off the top, and unusable "slag," which drained down into a fifteen-foot-tall cauldron, called a "ladle," which sat in a tunnel below the furnace. *Id.* When the ladle reached three-quarters of its capacity, standard procedure was to stop the flow of slag and remove the ladle using a specialized truck. *Id.*

One night, Mr. Delgado's supervisors pressured him and his shorthanded crew to work harder in order to compensate for a recent ten-day shutdown. 34 P.3d at 1151. Suddenly, an emergency situation occurred called a "runaway:" the ladle had reached three-quarters capacity, but the workers could not stop the flow of slag into the ladle, so it started overflowing. *Id.* The slag flowed faster than ever before, creating the worst runaway the plant ever experienced. *Id.* The supervisors could have stopped the runaway by shutting off the furnace, but they chose not to in order to avoid further economic losses. *Id.* Instead, they ordered Mr. Delgado to remove the ladle alone, despite the fact he had not ever done so during a runaway and molten slag was spilling over the ladle's brim. *Id.*

As Mr. Delgado entered the tunnel, he saw the ladle overflowing and radioed his supervisors to tell them he was not qualified or able to remove the ladle. 34 P.3d at 1151. Mr. Delgado's supervisors insisted he do it alone over his repeated protests and requests for help. *Id.* Shortly after he entered the tunnel, the lights shorted out, black smoke poured out of the tunnel, and Mr. Delgado appeared out of the smoke completely covered in flames. *Id.* He then collapsed before his coworkers could put him out. *Id.* The truck Mr. Delgado drove into the tunnel had burned all over, its windows and tires had melted, and the caps to its gas tanks were missing. *Id.* Mr. Delgado himself suffered third-degree burns over his entire body and died three weeks later. *Id.*

Mr. Delgado's widow brought claims of wrongful death and loss of consortium, prima facie tort, and intentional infliction of emotional distress against the employer and two co-workers. The district court and New Mexico Court of Appeals dismissed the claims on the grounds that the New Mexico Workers' Compensation Act provided the exclusive remedy for Mr. Delgado's death. *Id.* at 1150.

On review of these decisions, the New Mexico Supreme Court announced a three-pronged standard for when "willfulness renders a worker's injury non-accidental." *Delgado*, 34 P.3d at 1156. First, the employer must have engaged in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker. *Id.* This is an "objective threshold question" used to "determine whether a reasonable person would expect the injury suffered by the worker" given the employer's actions. *Id.* Second, the employer must have expected the intentional act or omission to result in the employee's injury, or have "utterly disregarded the consequences." *Id.* This prong examines the employer's "subjective state of mind," and requires more than an employer "negligently" failing to expect the employee's injury. *Id.* Finally, the employer's intentional acts or omissions must proximately cause the employee's injury. *Id.*

In *Morales*, the New Mexico Court of Appeals considered two consolidated tort actions brought by employees against their employers in the wake of the *Delgado* decision. 97 P.3d at 613-14. The plaintiff in the first case alleged his employer willfully or intentionally ordered him to fix a pump carrying a dangerous chemical, and that as he was fixing the pump some of the chemical was released, which caused the hood of his protective gear to lift resulting in injury. *Id.* at 614. In the second case, the plaintiff was injured while working on scaffolding sixteen feet above ground when a metal sheet slipped from the hands of another employee. *Id.* The plaintiff claimed his employer acted intentionally by failing to provide him with adequate safety equipment. *Id.*

The *Morales* court found that neither plaintiff established a *Delgado* claim. 97 P.3d at 617-19. The court found that the first plaintiff's claim could not survive summary judgment because "he had worked on a pump with the same equipment numerous times before, and his safety hood had even popped off in the past without causing any injury." *Id.* at 618. The court explained that "the presence of a dangerous chemical alone is not enough to show employer willfulness," and "the availability of other, better safety equipment does not equate with a showing that a reasonable

person would have anticipated [the plaintiff's] completion of a routine job using routine equipment would lead to an injury." *Id.* Similarly, the court found that the second plaintiff failed to state a *Delgado* claim because "there is no indication that the failure to provide safety devices was anything but negligent in this case." *Id.* at 619.

In reaching its conclusion, the New Mexico Court of Appeals stated that, when considering whether or not a claim is barred by the New Mexico Workers' Compensation Act, courts "must bear in mind the type of unconscionable conduct that *Delgado* sought to deter." *Morales*, 97 P.3d at 615-16. The court emphasized that the egregious conduct in *Delgado* was "a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation." *Id.* The court explained that *Delgado* was not intended to "eviscerate" the provisions of the New Mexico Workers' Compensation Act, but that it instead "merely sought to deter ... extreme employer conduct." *Id.* at 616.

The *Morales* court also discussed two federal cases interpreting *Delgado*. In one case, the employee alleged his employer failed to provide adequate training and supervision, failed to provide a safety device, and assigned the employee a task outside his normal work. 97 P.3d at 616 (citing *Cordova v. Peavey Co.*, 273 F. Supp. 2d 1213, 1216 (D.N.M. 2003), *aff'd* 111 F. App'x 992 (10th Cir. 2004) (unpublished)). The second case involved a worker who claimed his employer egregiously failed to provide safer equipment. *Id.*, ¶ 12 (citing *Wells v. US Foodservice, Inc.*, 95 F. App'x 302 (10th Cir. 2004) (unpublished) ). In each of these cases, the courts determined the plaintiffs did not meet *Delgado*'s requirements. 97 P.3d at 616. The *Morales* court agreed with these decisions, stating "the mere assertion that the employer did or did not do something that somehow led to the injurious event is not adequate to meet" the *Delgado test*. *Id.* Instead, the court explained that in order to defeat a pretrial dispositive motion, "plaintiffs must present evidence that the employer met each of the three *Delgado* elements through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado*." *Id.*

Similarly, in *Dominguez v. Perovich Properties, Inc.*, the New Mexico Court of Appeals found that an employer's failure to observe safety measures is not enough to establish a *Delgado* claim. 2005-NMCA-050, 111 P.3d 721, 727. In that case, an employee at a gravel pit was injured when he was standing on a conveyor belt and his supervisor, believing the employee had stepped off the belt, unexpectedly started the belt. 111 P.3d at 722. The employee claimed his employer's conduct was egregious because it failed to use lock-out devices, failed to report safety violations, and failed to obtain the required mining permit, among other things. *Id.*at 723. The New Mexico Court of Appeals held that "an employer's egregious and knowing general disregard for safety measures" does not generally establish a *Delgado* claim. *Id.* The court explained that the "general failure to provide safety devices" did not in and of itself make the employee's injury likely, and *Delgado* requires "more than the disregard of preventative safety devices." *Id.* at 727.

In addition, the court stated that, although ignoring safety requirements designed to prevent accidents is "appalling," "[t]he possibility . . . that an accident might occur because of an unexpected careless act of a co-employee does not meet the *Delgado* standard." 111 P.3d at 727. Instead, "the critical measure" is "whether the employer has, in a specific dangerous circumstance, required the employee to perform a task where the employer is or should be clearly aware that there is a substantial likelihood the employee will suffer injury or death by performing the task." *Id.*; *see also May v. DCP Midstream, L.P.*, 2010-NMCA-087, 241 P.3d 193, 197 (finding that "the absence of safety measures by itself demonstrates neither intent nor an inherent probability of injury," and "having an employee perform a routine, familiar task which he had performed before is not the same as sending an employee to face certain injury"); *Chairez v. James Hamilton Const. Co.*, 2009-NMCA-093, 215 P.3d 732, 734-35 (finding that the employer's modification of equipment in a way that made it more dangerous does not constitute a *Delgado* claim because there was no evidence suggesting that the employer intended the employee to be in a position where he would be exposed to the danger).

More recently, two cases in this Court have considered *Delgado* claims. Compare *Kidder v. Intel Corporation*, 2014 WL 12567157, **6-7 (D.N.M. July 14, 2014) (unpublished) (finding plaintiff, an equipment technician exposed to lead, established a *Delgado* claim where other cleaning techniques existed that could have limited the plaintiff's exposure to lead; the employer was aware that the cleaning technique used by the plaintiff exposed him to lead over a nearly twenty-four month period; and the employer knew the plaintiff should have worn a safety mask) with *Anchondo v. Basic Energy Services, Inc.*, 2015 WL 12777961, **1-2, 6-7 (D.N.M. March 18, 2015) (unpublished) (finding plaintiff, a derrickman on an oil rig, did not establish a *Delgado* claim where he was performing his routine and familiar task, pulling and cleaning rods from the oil well, and using regular equipment, and that his employer's denial

In light of the foregoing, Plaintiff's argument that the Waiver & Release is unenforceable based on Defendants' alleged reckless and intentional acts necessarily fails.

In sum, the Waiver & Release is sufficiently clear and unambiguous and the *Tunkl* factors weigh in favor of its enforceability. The Waiver & Release is limited in both scope and application and does not infringe on the public policy prohibition of waiving liability for intentional torts. The undisputed evidence demonstrates that Plaintiff was not coerced into signing the Waiver & Release and voluntarily agreed, as a condition of employment, to limit his avenues for recovery with respect to any work-related injuries to the New Mexico's Workers' Compensation Act. As such, the Court holds that the Waiver & Release is enforceable.[9]

### C.   Prima Facie Tort

It is undisputed that the Plaintiff's injury arose out of and in the course of his employment with Allied. It is also undisputed that the Waiver & Release did not "affect or diminish" Plaintiff's rights to workers' compensation benefits. Thus, absent evidence showing

---

of plaintiff's request for hot oil to resolve a paraffin buildup on the rods "was not extraordinary" because "it was Basic Energy's routine to order employees to continue to pull rods coated with paraffin after denying the employees hot oil to resolve the paraffin build-up and [the plaintiff] does not allege that this routine resulted in any injuries other than Anchondo's."). The *Anchondo* court further stated that requiring the plaintiff "to undertake a task which posed a safety concern or that was unsafe or dangerous is not necessarily the equivalent of ordering an employee alone to assume the obvious risk of certain death or extreme injury as occurred in *Delgado*." *Id.*

Courts interpreting *Delgado* have held that failure to provide safe equipment does not necessarily equate to a finding that an employer engaged in an intentional act or omission that is reasonably expected to result in injury. *See, e.g., May,* 241 P.3d at 197 (finding that, although the employer "allowed a negligently dangerous condition to persist" by using unsafe equipment, there is no indication that the employer "knew or expected" plaintiff's injuries would occur). In addition, "the availability of other, better safety equipment does not equate with a showing that a reasonable person would have anticipated [the plaintiff's] completion of a routine job using routine equipment would lead to an injury." *Morales,* 97 P.3d at 618.

[9] At least three other courts from other states have considered this same Allied disclaimer and found that it did not contravene public policy. *See Merlien v. JM Family Enterprises, Inc.,* 301 So.3d 1 (Fla. App. 4th Dist. 2020) (holding that disclaimer signed by security guard, waiving claims against clients of security company arising out of injuries covered by workers' compensation statutes, was clear and unambiguous and did not violate public policy and affirming summary judgment on negligence claim); *Bowman v. Sunoco, Inc.,* 65 A.3d 901 (Pa. 2013) (same); *Brown v. 1301 K Street Ltd. Partnership,* 31 A.3d 902 (D.C. 2011) (same).

that Plaintiff was harmed by Defendants' intentional acts, Plaintiff's remedy for his work-related injury pursuant to the Waiver & Release falls within the scope of the Workers' Compensation Act and he has waived his right to assert claims against Defendants. *See Quintero v. N.M. Dep't of Transp.,* 2010-NMCA-081, ¶¶ 5-6, 148 N.M. 903, 904–05, 242 P.3d 470, 471–72 (citing NMSA 1978 § 52-1-6(E) and *Galles Chevrolet Co. v. Chaney,* 92 N.M. 618, 620, 593 P.2d 59, 61 (1979) ("If the Work[ers]' Compensation Act applies, the employee's negligence action, if any, is precluded.").

To that end, Plaintiff added in his Second Amended Complaint a claim for prima facie tort against Defendants alleging that they were aware that the bolt cutters were insufficient for cutting the Amazon truck locks; that Defendants were aware that electrical grinders had been used on the locks at times; that Defendants intentionally forced Plaintiff to continue to cut the Amazon locks with the bolt cutters; and that Defendants knew with certainty that continued use of the bolt cutters would result in Plaintiff's injury. Doc. 31 at 4-5.

In his Response, Plaintiff similarly contends that he told Defendant Lane that other Allied employees had complained about and had been injured using the bolt cutters on the Amazon locks; that in the weeks before he was injured, Defendants allowed Allied employees to send the Amazon trucks to the UPS mechanics shop and utilize UPS grinders to cut the seals; that sometime thereafter, Defendant Lane gave a clear directive to Plaintiff that Allied employees were to cut the seals using the UPS bolt cutters and that the grinders would no longer be available; and that upon hearing this directive Plaintiff said something to the effect of "Leo, someone's going to get hurt." Doc. 45 at 10-11.

In sum, Plaintiff asserts that UPS and Defendant Lane knew of the dangers facing Allied employees caused by using the bolt cutters on the Amazon trucks, but still forced Allied security

guards to work under dangerous conditions. *Id.* Plaintiff asserts that the stance taken by UPS was "reckless at best, intentional or willful at worst." *Id.* Doc. 45 at 10-11.

In support, Plaintiff offers his own Affidavit in which he attests to the above contentions. Doc. 45-1. Plaintiff also attaches two affidavits of former Allied security guards in which one states, *inter alia*, that he "injured [him]self, straining to cut through an Amazon seal," and the other states, *inter alia*, that he had "difficulty cutting the seals due to an old rotator cuff injury." Doc. 45-2 at 1, ¶ 11, Doc. 45-3 at 1, ¶ 11. Both of the former Allied security guards attest that their duties included cutting the seals on the back of Amazon trailers with bolt cutters provided by UPS; that on occasion they were allowed to send the Amazon trucks to the UPS shop in order for the seals to be removed with the grinders; and that they raised the issues of their injuries and difficulties/dangers of using the bolt cutters on the Amazon seals to Plaintiff and Defendant Lane.[10] *Id.* at ¶ 12.

Defendants assert that Plaintiff has presented no material or admissible evidence that any UPS employee acted recklessly toward or intentionally harmed Plaintiff. *Id.* at 6, 9-10, Doc. 48 at 1-2, 7-9. Doc. 37 at 6. In support, Defendants attach the Affidavit of Leandro Lane, Area Security Manager for UPS, who attests that "[r]emoving bolt seals on freight units is a routine task for Allied security guards at the UPS Center on Comanche Road, and bolt cutters are routinely used in the shipping industry to remove bolt seals on freight units." Doc. 37 at 16, ¶ 5. Defendant Lane further attests that he has "no recollection of any person, other than Plaintiff,

---

[10] Affiant Lucero states he "injured [him]self, straining to cut through an Amazon seal." Doc. 45-2 at 1, ¶ 11. Affiant Twitchell states he had "difficulty cutting the seals due to an old rotator cuff injury." Doc. 45-3 at 1, ¶ 11. Neither of these affiants attest to seeking or receiving medical care for their injuries, reporting their injuries to Allied for purposes of workers' compensation, or submitting any kind of a formal complaint to either Allied or UPS. To survive summary judgment, "nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir. 1995) (citing *Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir.1991)).

who has claimed an injury from the use of bolt cutters to open bolt seals on trucks at the UPS Center at 4201 Comanche Road, NE, in Albuquerque, New Mexico." *Id.* at 16, ¶ 4.

In *Schmitz v. Smentowski,* the Supreme Court of New Mexico recognized a cause of action for prima facie tort. *See* 1990-NMSC-002, 785 P.2d 726. The underlying premise of prima facie tort is that a party who intends to cause injury to another should be liable for that injury if the conduct is generally culpable and is not justifiable under the circumstances. *Schmitz*, 785 P.2d at 734. There are four generally recognized elements of prima facie tort: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act. *See Lexington Ins. Co. v. Rummel,* 1997-NMSC-043, 945 P.2d 992, 995. "The terms malice and intent to injure have been used synonymously with our jurisprudence on prima facie tort." *Id.* Malice in turn is the "intentional doing of a wrongful act without just cause of excuse. This means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it." *Flores v. Baca*, 1994-NMSC-021, ¶ 18, 871 P.2d 962, 968 (internal quotation marks and citations omitted); *see also Jones v. Citizens Bank of Clovis*, 1954-NMSC-003, ¶ 5, 265 P.2d 366, 368.

In *Schmitz,* the Supreme Court of New Mexico emphasized the importance of limiting the cause of action for prima facie tort, because the prima facie tort was not intended to provide a remedy for every intentionally caused harm, rather it is a remedy for acts committed with intent to injure the plaintiff and without justification. 785 P.2d at 734; *see also Lexington Ins. Co.,* 945 P.2d at 995. Therefore, balancing the malicious intent of the defendant against both the justifications for the injurious act offered by the defendant and the severity of the injury is a

necessary step in determining whether a prima facie tort has been committed.  *Id.*  If "there is no evidence of an intent to injure, there is no need to proceed with the balancing test."[11]  *Id.*

Plaintiff bears a heavy burden to establish intent to injure.  *Lexington Ins. Co.*, 945 P.2d at 995 (citation omitted).  Intent to injure is distinct from intent to commit the act which results in injury.  *Schmitz*, 785 P.2d at 737-38; *see also Boatman's Bank of Butler v. Berwalk*, 752 S.W.2d 729, 833 (Mo. Ct. App. 1988) ("[P]roof on the element of intent to injure must be of an 'actual intention' to injure, not merely an intent to do the act which may result in the claimed injury.").  The plaintiff must produce more than a showing that injury is a natural and foreseeable consequence of the act.  *See Schmitz*, 785 .2d at 738 (explaining that evidence must demonstrate intent to injure beyond mere intent to commit the act that caused the harm and that a plaintiff must demonstrate more than mere insensitivity towards the injured party).  "To allow such a lax standard would be to invite every victim of an intentional act to bring an action in prima facie tort and would subvert the purpose of prima facie tort by eliminating the element requiring that defendant intended injury to the plaintiff."  *Id.*

The Court may decide whether Defendants intended to injure Plaintiff as a matter of law.  *Portales Nat'l Bank v. Ribble,* 2003-NMCA-093, ¶ 5, 75 P.3d 838, 840.

Viewing the material facts in a light most favorable to the nonmoving party, the Court concludes that Plaintiff has failed to carry his heavy burden and produce evidence sufficient to raise a material question as to whether Defendants intended to injure him.  The crux of Plaintiff's

---

[11] Because not every intentionally caused harm gives rise to an actionable tort, if intent to injure is established, courts must also balance the claimed tortious conduct "against its justification and the severity of the injury, weighing: (1) the injury; (2) the culpable character of the conduct; and (3) whether the conduct is unjustifiable under the circumstances." *Schmitz*, 785 P.2d at 734.  The alleged tortious conduct must also be wrongful or generally improper and unjustifiable in nature.  *Id.* at 734-35.  In addition to balancing these factors, New Mexico courts must also consider "(1) the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive."  *Id.* (internal quotation marks and citation omitted).

prima facie tort claim is that Defendants forced him to use bolt cutters to cut the Amazon seals causing him to be injured, even though Defendants were on notice that other Allied employees had been injured while using the bolt cutters on the Amazon seals, and where Defendants had an alternative safer option for cutting the Amazon seals.  Yet even assuming Defendants knew that using the UPS mechanics shop to remove the Amazon seals was a safer option,[12] or had notice that Allied employees had been injured while using the bolt cutters to cut the Amazon seals,[13] these facts do not establish that Defendants "intentionally and maliciously" acted to injure Plaintiff when they required him to use the bolt cutters as part of his security duties.  To the contrary, the undisputed evidence demonstrates that Defendants employed a routinely used method for cutting seals on freight trucks, as opposed to choosing this method with the *actual intent* to injure Plaintiff.  While Defendants' chosen method may have been insensitive to Plaintiff's expressed concerns,[14] Plaintiff's proffered evidence, at most, demonstrates an intent to do an act which resulted in injury, which is insufficient to create a material question as to whether Defendants had the actual intent to injure him.  *Schmitz*, 785 P.2d at 737-38.

In sum, there is no need for a trier of fact to balance the intent to injure against the justifications for the injurious act because Plaintiff has failed to produce evidence sufficient to raise a material question as to whether Defendants intended to injure him.  *Lexington Ins. Co.,* 945 P.2d at 995; *Portales Nat'l Bank,* 75 P.3d at 840.

---

[12] Plaintiff has not supported his assertion that using the grinder for cutting the Amazon seals was safer than using the bolt cutters with competent evidential material.  *See Murray*, 45 F.3d at 1422 (conclusory and self-serving affidavits are insufficient for defeating a motion for summary judgment).

[13] *See* fn. 10, *supra*.

[14] *See Murray*, 45 F.3d at 1422.

### D. **Defendants Are Entitled to Summary Judgment**

The Court finds that there are no genuine issues of material fact and that Plaintiff has not shown that the Waiver & Release is unenforceable or that his workplace injury was the result of Defendants' "actual intent" to injure him. The Court further finds that pursuant to the terms of the Waiver and Release, Plaintiff waived his right to "make a claim, commence a lawsuit, or recover damages or losses, including those for pain and suffering or lost wages" against Defendants "arising from or relating to injuries that may occur in the course and scope of [his] employment or while on the job site." Doc. 37 at 15. Defendants, therefore, are entitled to summary judgment as to all claims in Plaintiff's [Second] *Amended Complaint for Compensatory and Punitive Damages* (Doc. 31).

## VI. **CONCLUSION**

For all of the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment (Doc. 37) is well taken and is **GRANTED**.

**IT IS SO ORDERED.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding By Consent**